**SO ORDERED.**

**SIGNED this 30th day of May, 2013.**



*Dale L. Somers*
Dale L. Somers
United States Bankruptcy Judge
_____

Designated for on-line use but not print publication
# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **In Re:** | |
| **DANIEL J. HUEHL,** | **CASE NO. 10-20582** |
| **DEBTOR.** | **CHAPTER 7** |
| **MILLARD PACE,** | |
| **PLAINTIFF,** | |
| v. | **ADV. NO. 10-6106** |
| **DANIEL J. HUEHL,** | |
| **DEFENDANT.** | |

### MEMORANDUM OPINION AND ORDER
### DENYING PLAINTIFF'S FIRST AMENDED COMPLAINT
### OBJECTING TO THE DISCHARGEABILITY OF DEBT

In this adversary proceeding, Plaintiff Millard Pace claims that the actions of

Debtor, Daniel J. Huehl (Debtor), resulted a debt of $497,820 which is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). The matter is under advisement following trial.[1] The Court has jurisdiction.[2] For the reasons stated below, the Court denies the relief sought.

**FINDINGS OF FACT.**

Plaintiff Pace is the owner-operator of a mobile home park in Salina, Kansas, called Patio Mobile Home Park. He also owns about 11 acres on 9th Street in Salina, which has three buildings, and was used to store mobile homes and mobile home parts. The Debtor owns and operates Mid-Kansas Movers, a company that moves and sets up mobile homes. The Debtor also buys and sells mobile homes, and performs construction and demolition work in association with them. He purchases mobile homes at auctions and maintains an inventory of them for sale. Pace and Debtor had business dealings over the years, they saw each other frequently, and Pace considered Debtor to be his friend.

On March 4, 2010, Debtor filed a Chapter 7 bankruptcy petition. On September 15, 2011, Pace filed a proof of claim for $497,820, plus attorney's fees and costs, as

---

[1] Plaintiff appeared in person and by Wesley F. Smith and Bradley R. Finkeldei of Stevens & Brand, LLP. Debtor appeared in person and by David P. Eron of Eron Law, P.A.

[2] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). There is no objection to venue or jurisdiction over the parties.

allowed under § 506.[3] The basis for the claim is stated to be "fraud and conversion."[4] Attached to the proof of claim is a copy of Pace's First Amended Complaint Objecting to the Dischargeability of Debt, which had been filed on September 3, 2010.[5] As detailed in Pace's post-trial brief,[6] the claim consists of three elements. One element is for $70,575 in lost profits on three mobile homes which Pace purchased from Debtor. The second is for the return of money Pace gave Debtor to fund an alleged joint venture to buy 12 mobile homes ($143,000, plus interest), and the recovery of lost joint-venture profits (between $151,393 and $896,000). The third is for the value ($15,000, plus interest) of two pieces of equipment owned by Pace which Debtor allegedly converted.

**A. The 2002 and 2003 contracts for the purchase of three identified mobile homes.**

On July 16, 2002, Pace and Debtor entered into a contract for Pace to purchase two mobile homes, a 1996 12-foot by 60-foot Skyline and a 1996 14-foot by 56-foot Skyline, from Debtor for $12,000.[7] Pace paid the purchase price. On February 27, 2003, they entered into a contract for Pace's purchase of a third home, a 1999 40-foot by 28-foot Atlantic.[8] Pace paid the purchase price of $11,500.

---

[3] Claim no. 17.

[4] *Id.*

[5] Dkt. 14.

[6] Dkt. 120 at 11-12; *see also* exh. 53.

[7] Exh. 17.

[8] Exh. 11.

3

Pace testified that neither of the homes purchased under the July 16, 2002 contract was delivered. Pace denies having ever seen the 12- by 60-foot home after he bought it. Debtor, however, testified that the 12- x 60-foot home was delivered to Mid-Kansas, that Pace inspected it, and then directed that it be delivered to his 9th Street property. As to the other home described in the July 16, 2002 contract, Debtor contends he placed a 1995 14-foot by 56-foot Skyline home at the Patio Mobile Home Park, and Pace accepted the home. Pace agrees that the 1995 home is located in the Patio Mobile Home Park, but contends that the home he intended to purchase was never delivered because the contract was for a 1996 Skyline, and the home he accepted was a 1995. Debtor testified that the model year error was inadvertent and did not affect the value of the home.

Debtor testified that he placed and Pace accepted the 1999 Atlantic under the February 27, 2003 contract. But Pace testified that the home was not properly installed since there was a problem with the electric utility hook ups. Debtor testified that the problems were not his responsibility. Because it lacks utilities, the home was not lived in after it was moved to the Patio Mobile Home Park.

Pace claims damages relating to the purchase of all three homes. Since the homes were purchased for rental, Pace's damage claim for these homes is based on alleged lost profits, at a rate of 30% of the purchase price per year, for ten and one-half years as to the 2002 purchases, and for nine and one-half years as to the 2003 purchase. Debtor challenges Pace's right to such damages based upon his view that he delivered three homes as required by the contracts and that any losses sustained were caused by Pace's

4

actions.

**B. The March 2003 agreement.**

During January 2003, Pace and Debtor began discussing the transaction which is the basis of the second claim and the source of the primary controversy in this case. They agree that as a result of those discussions, a Mid-Kansas Movers receipt form dated March 4, 2003,[9] was prepared and delivered to Debtor, with the following hand-written on it:

> Mobile home purchases
> 12 units total amount $139,000
> wire of funds
> Premier Members FCU
> Longmont Colorado
> Contract per Unit — Titles
> serial # will be Delivered
> once Units are pd. for
> Millard Pace.[10]

They also agree that Pace wire-transferred the $139,000 to Debtor and later advanced an additional $4,000 to him. But that is the end of the agreement; the parties have widely divergent views of the terms of their agreement and the performance of that agreement.

Pace testified as follows. In January 2003, Debtor had approached him about a business deal where they could make "a lot of money" — "two to three times [their]

---

[9] The year written on the document is 2002, but the parties agree the document was actually created in 2003.

[10] Exh. 30.

money."[11] The deal was to jointly select and purchase used mobile homes from bid sheets supplied to Debtor by a company called Conseco, which was in bankruptcy, and then to sell the homes and evenly split the profits. The final agreement was to purchase a total of 12 homes for $139,000. According to Pace, the parties identified 12 homes from the Conseco sheets on which to bid and determined the price for each. But Pace did not contemporaneously maintain a record of the selected homes and does not remember which homes were to be purchased. On March 5, 2003, Pace wired Debtor $139,000 for the purchases. Debtor issued the document described above. It was not a contract, but was a receipt for money Pace paid to Debtor. The mobile homes were to be moved to Salina immediately after purchase and, once there, each home would be examined and Pace would determine whether he would purchase the home at Debtor's purchase price for placement in the Patio Mobile Home Park, or whether the home should be sold to third parties, pursuant to the business agreement for the sharing of profits.

Debtor Huehl's verison of the agreement is very different. He testified that during January through March 2003, he and Pace on several occasions discussed Pace's plan to purchase 12 mobile homes for the Patio Mobile Home Park, but there was no agreement to purchase any specific home. The receipt dated March 4, 2003, acted as an agreement between the parties for the purchase of 12 mobile homes, to be later identified, for a total price from Pace of $139,000. The receipt was similar to the documentation used by the

---

[11] Tr. I, 30:1-8.

6

parties for specific purchases in the past. Once the homes were delivered to Debtor, Pace would select one or more homes from Debtor's inventory, at which time a contract for the purchase of the specific home or homes would be written.

The parties agree that on March 7, 2003, Debtor purchased eight mobile homes from Conseco for a total purchase price of $93,500. They also agree that in May 2003, Debtor purchased another group of eight homes from Conseco for a total purchase price of $77,000. Some of these homes were sold to third parties, but no profits were distributed to Pace. Through the first of June 2003, Pace had not seen any homes or any documentation about which homes had been purchased.

In June 2003, Debtor provided Pace with a document listing 12 mobile homes, which the parties refer to as the "Mel Pace Inventory," and materials in support. The Debtor represents the document as identifying 12 homes which he had available for Pace under the March 2003 contract. Pace testified that Debtor represented the document as identifying the 12 specific homes purchased from Conseco as part of the March 2003 agreement. But, according to Pace, a comparison he prepared of the homes on the Mel Pace Inventory (as Pace understood Debtor's representation of the content of the inventory) with documents provided by Conseco during the litigation shows that the list was false, fraudulent, and untrue. Pace did not select 12 homes from the Mel Pace Inventory for delivery.

The parties met on August 26, 2003, to discuss their disagreement. The meeting, which was secretly recorded by Pace, covered a wide range of issues, but did not result in

7

any understanding or resolution of the issues. At the meeting, Debtor gave Pace additional documents concerning mobile home purchases. Pace alleges that at the meeting, Debtor recalled that there was an agreement to split profits from the sale of homes, but at trial, Debtor denied the parties had made such an agreement.

Because the parties' understandings of the March 4, 2003 agreement are so divergent, the evidence of the extent of performance is also conflicting. It is uncontroverted that three mobile homes were placed by Debtor in the Patio Mobile Home Park, in addition to those delivered under the July 2002 and February 2003 contracts. Debtor contends these three additional homes were placed in the Patio Mobile Home Park under the March 4, 2003 agreement. It is also uncontroverted that another five mobile homes were delivered by Debtor to Pace's 9th Street property. According to Debtor, these homes were also delivered under the March 4, 2003 contract, for a total delivery of eight homes, six of which were purchased from Conseco. Debtor testified that he had sufficient inventory for Pace to select an additional four homes to finish performance, but Pace refused to allow the placement of any additional homes.

Although acknowledging the deliveries occurred as stated, Pace does not accept Debtor's assertion that the deliveries were in performance of the March 4, 2003 agreement. As to the three homes placed in the Patio Mobile Home Park, Pace contends that not all are attributable to the March 4, 2003 contract. Pace has refused to accept the delivery of homes to the 9th Street property as performance under the agreement.

Through discovery in this case, Pace learned the details of the homes purchased by

8

Debtor from Conseco in 2003. He prepared exhibit 42, a list of 12 of the 16 homes which Debtor purchased from Conseco during the relevant time period for $135,500. Pace contends these homes should be considered to be the 12 homes governed by the March 4, 2003 agreement. Of these, one is currently in the Patio Mobile Home Park, five are on the 9th Street property, and the remaining six were sold by Huehl to third parties. Pace complains that Debtor did not split the profits from the sales of the 12 listed homes. For use in the litigation, Pace also created a chart containing information about 29 mobile homes which were allegedly purchased by Debtor or held in his inventory. The exhibit is intended to highlight the inconsistencies and errors in the documents provided to Pace at the Mel Pace Inventory meeting and the August 26, 2003 meeting.

As damages for fraud relating to the March 4, 2003 agreement, Pace claims $248,842 for return of the $143,000, plus interest at 6% for nine and one-half years, plus lost profits in an indefinite amount. He claims he lost profits between a low of $151,393 and a high of $896,000. The lost profit calculations are based upon exhibit 42, the list of 12 homes which Debtor purchased from Conseco and which Pace alleges should be considered to be the 12 covered by the March agreement. He testified that if he had accepted none of the homes, they could have been sold to third parties for $174,000 in profit, one half of which is $87,000, the amount he claims should have been paid to him. To this alleged loss, Pace adds interest at 6% for nine and one-half years, for a total lost profit claim of $151,393. Alternatively, Pace testified that if he had accepted all 12 homes, he could have rented them for an annual profit of $94,322, which for nine and

9

one-half years would have equaled approximately $896,000. Debtor challenges Pace's claim in several respects. He argues that Pace accepted eight homes under the March 4, 2003 agreement, he provided evidence that the NADA value of the eight homes nearly equaled the $139,000 contract price for 12 homes,[12] and he argues that Pace should have but did not mitigate his damages, since it was Pace's conduct that prohibited Debtor's completion of delivery of the 12 homes.

**C. Claim for value of equipment.**

As to the claim for conversion of equipment, Pace testified that in 2003, at Debtor's request, he loaned Debtor a 1983 International dump truck. The windows were out of the truck when loaned, and Debtor was to replace them in return for use of the truck. Pace testified that he also loaned Debtor a backhoe, which was operational when borrowed.

Debtor testified that Pace gave him these two items to have them repaired, as they were not operational. Debtor's brother worked on the dump truck's loader (the cylinder that raises and lowers the bed) and transmission, but the truck could not be made to operate. The truck repairs completed had an estimated cost of $5,000. Debtor testified that the backhoe had broken windows, a flat tire, and stuck hydraulics, and that the engine would turn over but not start. A third party spent time attempting to repair the backhoe but ultimately advised Debtor that it would be too costly to repair. The estimated value of

---

[12] See exh. 34, listing the NADA value of the eight homes, plus two of the homes delivered under the earlier contracts, which totaled $206,100.

the parts and hours spent trying to repair the backhoe was $3,000. Debtor testified that Pace did ask for return of the truck and backhoe, but Debtor declined to return them because of the ongoing dispute between the parties and the unpaid repair work.

Pace seeks to recover the value of the equipment as a nondischargeable debt. He testified that each piece of equipment had a value of $7,500 when Debtor obtained possession. He asserts he is entitled to recover the total value, $15,000, plus interest at 6% for nine and one-half years, for a total of $26,091.38.

**DISCUSSION.**

    **A. Exceptions to discharge.**

Pace contends that his fraud and conversion claims against Debtor are nondischargeable under § 523(a)(2)(A), (a)(4), and (a)(6). "'Exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor.'"[13] The burden of proving that a debt falls within a statutory exception is on the party opposing discharge.[14] To establish that a debt is nondischargeable under § 523(a)(2)(A), "the creditor must prove the following elements by a preponderance of the evidence . . . : The debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was reasonable; and the debtor's

---

[13] *Oklahoma Dep't of Sec. v. Wilcox*, 691 F.3d 1171, 1174 (10th Cir. 2012) (*quoting In re Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008)).

[14] *Id.* (*citing Grogan v. Garner*, 498 U.S. 279, 283 (1991)).

11

representation caused the creditor to sustain a loss."[15] The portion of § 523(a)(4) that Pace relies on excepts from discharge "any debt . . . for fraud or defalcation while acting in a fiduciary capacity." This exception applies only if Pace establishes a fiduciary relationship between himself and Debtor, and fraud committed by Debtor in the course of that relationship.[16] Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." "There must be proof that the injury was inflicted intentionally and maliciously. The element of malice distinguishes nondischargeable intentional torts from ordinary intentional tort actions."[17]

But, of course, before a claim can be excepted from discharge, there must be an allowed claim. Pace filed a proof of claim for $497,820. At trial, Debtor challenged the allowance of each element of the claim, and overcame the prima facie case arising from the filing of the proof of claim. Pace therefore has the burden of persuasion to prove the validity of each element of his claim by a preponderance of the evidence.[18]

**B. Pace's $70,575 fraud claim relating to the July 2002 and February 2003 contracts is not excepted from discharge.**

---

[15] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[16] *Id.* at 1371. This exception covers defalcation, as well as fraud, by a fiduciary, but Pace relies only on assertions of fraud. Consequently, the Court has had no occasion to consider the Supreme Court's recent decision about the meaning of "defalcation" in § 523(a)(4). *See Bullock v. Bankchampaign, N.A.*, ___ U.S. ___, 2013 WL 1942393 (May 13, 2013).

[17] 3 William L. Norton, Jr., and William L. Norton III, *Norton Bankruptcy Law & Practice 3d*, § 57:44 at 57-125 (Thomson Reuters/West 2012).

[18] 3 *Norton Bankruptcy Law & Practice 3d*, §48:28 at 48-80.

12

Under Kansas law, damages for fraud in a sale of property seek to provide the plaintiff with the benefit of his bargain.[19] "[A] purchaser who has been defrauded by false representations regarding the property bought may recover as damages the difference between the actual value of the property at the time of sale and the value the property would have had if the representations had been true."[20] Lost profits may be recovered if a representation of future profits was part of the bargain and if the future profits are not speculative.[21]

As to the three homes purchased under the July 2002 and February 2003 contracts, Pace has failed to show that he is entitled to recover damages of $70,575 for fraud. As stated above, the general measure of damages for fraud in the sale of personal property is the difference between the value of the property as represented and as sold. Pace does not seek an award under this standard. Rather, his claim is for lost rental income from the three homes, calculated at a rate of 30% of the purchase price per year, for ten and one-half years as to the 2002 purchases and for nine and one-half years as to the 2003 purchase. But there is no allegation and no evidence that Debtor made any representations about Pace's ability to make profits from the rental of the homes sold. Under these circumstances, lost profits are not recoverable as damages for fraud. In essence, Pace is seeking contract damages for alleged fraud; the law does not allow for

---

[19] *Fisher v. Mr. Harold's Hair Lab, Inc.*, 215 Kan. 515, 527, 527 P.2d 1026, 1036 (1974).

[20] *Hoffman v. Haug*, 242 Kan. 867, 872, 752 P.2d 124, 128 (1988).

[21] *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1160 (10th Cir.1985).

13

such recovery.

Further, even if Pace had proven damages caused by fraud arising from the July 2002 and February 2003 contracts, that claim would not be excepted from discharge. To except a claim from discharge under § 523(a)(2)(A), the creditor must prove a representation known to be false when made and made with the intent to deceive the creditor. Pace's evidence does not include these elements. The only representation possibly fitting these criteria is the error in the year of the 14- by 56-foot Skyline home. But there is no evidence that this representation was intentional or even known to be false when made. Section 523(a)(4), fraud while acting in a fiduciary capacity, and § 523(a)(6), for claims arising from willful and malicious injury, clearly are not applicable.

**C. Pace's claim for damages for fraud relating to the March 2003 agreement is not excepted from discharge.**

Pace's claim for fraud damages arising from the March 2003 agreement is composed of two portions, the return of his investment ($143,000, plus interest) and the recovery of lost profits (in an amount between $87,000, plus interest, and $896,000). But these elements do not reflect Pace's loss of the benefit of the bargain and are not adequately supported by Pace's evidence. Return of investment is not a generally accepted measure of loss for fraud; when there is at least partial performance of the bargain, return of the consideration does not accurately measure the difference between the bargain as represented and as performed. It is undisputed that Pace paid Debtor

14

$143,000.  Assuming Pace's version that there were 12 specific homes that were identified to the March 4, 2003 agreement, there is evidence that Debtor delivered one of those 12 homes to Pace at the Patio Mobile Home Park and five of the homes to Pace's 9th Street property.  Since Pace has benefitted from the receipt of these homes, his claim for return of investment under his verison of the agreement, if allowed, should have been reduced by the value of these accepted homes.  Of course, Debtor contends that he delivered a total of eight, not six, homes under the March 4, 2003 agreement, which would further reduce the difference between the value of the homes as represented and as delivered.

    The lost profit damages claimed by Pace are not recoverable.  Pace presented a range of lost profits damages, apparently believing that the Court would determine the appropriate amount, but the Court finds neither measure to be appropriate.  The Court declines to find Pace is entitled to one half of the profits which would have been made if 12 homes had been sold to third parties.  As discussed below, the Court concludes that (1) Pace has not proven there was an agreement to share profits as to 12 homes, and (2) if there were such an agreement, the amount of profits allegedly lost was speculative.  If the agreement is construed to be one for the sale of 12 mobile homes to Pace, his proper measure of damages for fraud would be the difference between the value of the homes as represented and their true value.  Since there is no evidence, and not even an allegation, that Debtor made representations as to Pace's future profits if he purchased 12 homes, lost profits damages cannot be awarded under the benefit of the bargain measure of

15

Case 10-06106   Doc# 127   Filed 05/30/13   Page 15 of 20

damages.

Further, if Pace had proven damages for fraudulent inducement in the making of the March 2003 agreement, such damages would not be excepted from discharge. As the findings of fact show, the evidence as to the terms of the agreement between Pace and Debtor, and its performance is highly inconsistent. It is as if the parties are talking about two separate transactions. In many cases, a court can resolve such conflicts based upon the credibility of the parties, the testimony of third parties, and exhibits. But that is not possible in this case. The Court finds that neither Debtor nor Pace was very credible when testifying. The events in issue occurred almost ten years before the testimony was given. Each party's memory of the events appeared to be tailored to support his position, rather than to report what actually happened. Other than the March 4, 2003 receipt, there is no documentation of the agreement, and the receipt establishes only the payment of $139,000 for 12 unidentified mobile homes. The parties agree that the receipt did not state the entire agreement. There were no witnesses other than Debtor and Pace. The exhibits are voluminous, but they fail to illuminate the central question — what was the agreement between Pace and Debtor in March 2003 when Pace transferred $139,000 to Debtor?

Since the Court cannot determine the terms of the March 2003 agreement, it must also determine based upon the evidence presented that Pace has failed to satisfy his burden to establish the elements for exception from discharge under § 523(a)(2)(A). Construing the exception in favor of Debtor, the Court finds the evidence is insufficient to

16

conclude that Debtor made a false representation concerning the March 4, 2003 agreement, that Debtor made the representation with the intent to deceive Pace, or that Debtor's representation caused Pace to sustain a loss.

The Court also finds insufficient evidence to establish the exception from discharge under § 523(a)(4) for "any debt . . . for fraud or defalcation while acting in a fiduciary capacity." Pace's allegation of a fiduciary relationship is based upon his interpretation of the March 2003 agreement as establishing a joint venture or partnership between him and Debtor.[22] But the evidence does not support the finding of a joint venture or partnership. Also, the element of fraud has not been proven.

Finally, the Court finds insufficient evidence of willful and malicious injury to except the claim from discharge under § 523(a)(6). There is absolutely no evidence that Debtor caused Pace an injury which was inflicted intentionally and maliciously.

**D. Pace's claim for $26,091.38 for conversion of two pieces of equipment is denied, and any damages arising from Pace's loaning of the equipment to Debtor are not excepted from discharge.**

Pace contends that he loaned Debtor two pieces of equipment which Debtor converted by refusing to return them. Debtor agrees that he has possession of the equipment, but states that he has not returned the equipment because Pace will not pay for the repairs made and because of the ongoing dispute with Pace.

Under Kansas law, conversion is "defined as 'the unauthorized assumption or

---

[22] Even if there were evidence of a joint venture or partnership, a finding of a fiduciary relationship for purposes of the exception to discharge in § 523(a)(4) would not automatically follow.

17

exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.' . . . A conversion may be based upon the detention of or unreasonable withholding of possession from one who has the right to possess it."[23] "If the 'possession of property is lawful at the outset, conversion can only occur when the possessor refuses an owner's demand for return of the property.'"[24] But the refusal to return personal property based upon a proper justification is not conversion.[25] "Where property is detained to enforce payment . . . of expenses incurred in connection with the property, trover [conversion] will lie where the possession was wrongful but not where the possession was rightful."[26]

Both Pace and Debtor agree that Debtor rightfully acquired possession of the two pieces of equipment from Pace. There is no dispute that the equipment was repaired while in the possession of Debtor and that Pace has not paid for the repairs. The Court cannot determine from the evidence that Debtor's failure to return the equipment was wrongful, and therefore a conversion. A conversion occurred only if Pace's testimony is accepted as true. Pace appears to contend that the equipment, or at least the dump truck,

---

[23] *Queen v. Lynch Jewelers, LLC*, 30 Kan. App.2d 1026, 1036, 55 P.3d 914, 921 (2002) (*quoting Moore v. State Bank of Burden*, 240 Kan. 382, 386, 729 P.2d 1205 (1986)).

[24] *In re Independent Serv. Orgs. Antitrust Litig.*, 964 F. Supp 1469, 1476 (D. Kan. 1997) (*quoting Judson Bldg. Co. v. First Nat'l Bank*, 587 F.Supp. 852, 856 (E.D. Tex. 1984)).

[25] *Queen v. Lynch Jewelers, LLC*, 30 Kan. App.2d at 1036-38, 55 P.3d at 921-22 (after buyer revoked acceptance, seller's refusal to return goods to buyer could not be conversion).

[26] 90 C.J.S. *Trover and Conversion* § 39, *available on Westlaw at* 90 C.J.S. Trover and Conversion § 39 (database updated March 2013).

was given to Debtor to use in exchange for repairs, so that he is entitled to its return without paying the repair costs, particularly since no repair bills have been presented to him.  But Pace's version of the events occurring almost ten years ago is not more credible than Debtor's version that he obtained the equipment for the purpose of repairing it, which he has done and for which he has not been compensated.  Under Debtor's version of the facts, there is no conversion, since Debtor's initial possession of the equipment was rightful and Debtor has not been compensated for repairs made while the equipment was in his possession.  Pace has therefore failed to sustain his burden to show that Debtor is obligated to him for conversion.  Absent a valid claim, there can be no exception of the debt from discharge.

Morever, assuming Pace had made out a case of conversion, the Court would not rule that such claim is excepted from discharge.  Debtor's conduct relating to the equipment does not rise to the level required for exceptions to discharge under § 523(a)(2)(A), (a)(4), or (a)(6).  The dispute over the equipment is simply the result of a transaction that went sour because of the mistrust engendered between the parties by the larger issues relating to the sales of mobile homes.  As to the equipment, there is no evidence of any misrepresentation, fiduciary malfeasance, or intentional and malicious injury.

**CONCLUSION.**

For the foregoing reasons, the Court denies Pace's First Amended Complaint Objecting to the Dischargeability of Debt.

19

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058, which makes Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

# # #